UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:06-CR-64 |
| | ) | (JARVIS/SHIRLEY) |
| KEITHAN HUNTER | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the district court as may be appropriate. This matter is before the Court upon Defendant Keithan Hunter's Motion To Suppress Evidence Obtained On May 21, 2006 [Doc. 23], filed on August 4, 2006. The parties came before the Court for an evidentiary hearing on October 3, 2006. Assistant United States Attorney Tracee Plowell was present representing the government. Attorney Brian Hunt was present representing Defendant Keithan Hunter, who was also present. At the conclusion of the hearing, the Court took the motion and related filings under advisement.

**I. POSITION OF THE PARTIES**

Defendant Keithan Hunter moves [Doc. 23] the Court to suppress all evidence illegally obtained by law enforcement officers as a result of the searches and/or seizures of

1

Defendant's person and Defendant's vehicle on May 21, 2006. Defendant contends [Doc. 24] that he was lawfully in the parking lot of the Quick Market on North Cherry Street in Knoxville, Tennessee, on May 21, 2006, when (1) he was unlawfully searched and unlawfully arrested, and (2) his vehicle was also unlawfully seized and unlawfully searched, by an officer of the Knoxville Police Department ("KPD"), all without a warrant and without probable cause, in violation of the Fourth Amendment.

The government denies [Docs. 30 and 32] that the evidence was unlawfully obtained, stating that a uniformed police officer of the KPD responded to a complaint of drug trafficking in the parking lot of the Quick Mart store located on Cherry Street in Knoxville, involving a brown pickup truck. The officer responded and observed Defendant Hunter inside a brown Ford pickup truck. The officer called out to Defendant and Defendant engaged in conversation with the officer. The officer explained to Defendant why he was there and asked him for consent to search the pickup truck, to which Defendant said, "go ahead." The officer did not immediately search the vehicle, but instead continued to question Defendant. Defendant became increasingly more agitated and suddenly walked away from the officer, toward the Quick Mart. The officer called out for Defendant to stop, but Defendant ignored the officer's commands and entered the store. The officer followed Defendant and observed him drop a small bag containing what appeared to be illegal narcotics, behind a cooler in the store. The officer grabbed onto to Defendant, who then pulled away and fled on foot from the store. The officer returned to the store to retrieve the bag, but it could not be located. Defendant did not return to the scene or his vehicle. The officer called for a tow truck to impound the abandoned vehicle. The officer conducted an inventory search of the vehicle and, pursuant to the search, the officer recovered a loaded firearm and quantity of crack cocaine.

## II. SUPPRESSION HEARING TESTIMONY

a. Testimony of Samuel Riveras

The only witness called by the government was Samuel Riveras ("Riveras"). For the past 20 years, Riveras has been employed as a patrol officer with the Knoxville Police Department ("KPD"). He estimated that he had made "thousands" of arrests during his career and that 30-40 percent of those arrests were narcotics related, while 10-20 percent were firearms related. Riveras testified that he was working alone on May 21, 2006. He stated that he worked from 2 p.m. until 11:30 p.m. that day and that he wore a patrol uniform and was in a marked police vehicle. Riveras indicated that the patrol car was equipped with audio/video recording equipment. The government played the tape in court [Gov. Ex. 1]. The following description of the facts combines the actual video (and times noted therein) with the court testimony for a chronological overview of the evidence.

Riveras testified that on May 21, 2006 at 5:22 p.m., he was dispatched to the Quick Mart store located at 701 North Cherry Street in Knoxville, Tennessee. He described this area as being a high crime area. Dispatcher informed that a black male in a beige, older model pickup truck, with license tag number RMQ140, was reported to be dealing drugs at that location. Riveras testified that he was three (3) minutes from the Quick Mart store when he received the call from dispatch. At 5:29:08 p.m., Riveras's patrol car pulled into the Quick Mart. At 5:29:19 p.m., Riveras pulled in behind a late model Ford pickup truck and stopped. He testified that when he pulled in behind the truck, it was sitting next to the gas pumps. He described the vehicle as a beige, Ford pickup truck and stated that the tag number on the truck matched the tag number given by dispatch.

3

Riveras testified that he observed a man wearing a hat sitting in the driver's seat. A few seconds later, the man in the truck exited the vehicle and began to walk away from the truck and the patrol vehicle. At 5:29:28, Officer Riveras stepped out of the patrol vehicle and, as he started to walk toward Defendant, said, "Keithan." At this time, Defendant turned and looked at Riveras and then began walking toward Riveras. Riveras testified that he knew Defendant from prior law enforcement contacts. He also stated that he knew Defendant was a career offender.

At 5:29:42 p.m., Riveras asked Defendant whether he still had a Durango. Riveras testified that a "BOLO" (be on lookout) was put out forty-five minutes to an hour before he responded to the Quick Mart call. The BOLO was for a red Dodge Durango involved in a "shots fired" on Tenth Avenue, which was approximately 5-6 blocks from the Cherry Street Quick Mart. Riveras testified that he knew Defendant Hunter owned a red Dodge Durango. Defendant told Riveras that the Durango was his wife's car and that they were getting a divorce.

At 5:29:49 p.m., Riveras asked to see Defendant's I.D. Defendant immediately turned, walked back to the truck and opened the truck door. Riveras told Defendant to "go slow" and grabbed him by the shoulder when Defendant reached into the vehicle. Defendant retrieved his I.D. from the truck and turned back around to hand it to Riveras, all the while saying, "you know me" and things of that nature. At 5:30:13 p.m., Riveras notified dispatch that he had Keithan Hunter. At 5:30:15 p.m., Defendant said, "What did I do?" Riveras responded, "I don't know yet."

At 5:30:26 p.m., Riveras had Defendant turn around and place his hands on the truck in order for Riveras to conduct a pat down search. At 5:30:41, Riveras finished patting Defendant down. He did not recover any weapons or contraband from Defendant's person. At 5:30:55 p.m., Riveras pointed to the Ford pickup truck and said, "Is this yours?" Defendant stated that he used

4

the truck for cutting grass and that he had not been driving the Durango that day.

At 5:31:52 p.m., Riveras said, "Let me tell you why I'm here. Somebody called and said there was a guy sitting in a truck dealing drugs and that a guy in there [Riveras pointed toward the Quick Mart] was going to get them." At this time, Defendant said, "oh, no, no, no, no, no." Defendant then proceeded to call out to two men who were standing next to a parked vehicle in the Quick Mart parking lot, trying to get them to corroborate his story that he was just at the store to pick somebody up to help him cut grass. Riveras testified that Defendant's behavior became more heightened and fidgety when he told Defendant why he was there and that Defendant seemed nervous.

At 5:32:30 p.m., Riveras said, "Are you going to let me look through your truck?" Defendant replied, "Yes, Sir. You can go ahead." At 5:32:38 p.m., Riveras said, "When I get someone else out here, I'll take a look at it." Riveras testified that he waited to search the vehicle because he did not have any back up and he was concerned that Defendant might have a weapon. He testified that at the time he asked Defendant for consent to search the vehicle, Defendant was not restrained or threatened.

At 5:32:41 p.m., Defendant started walking toward the two men standing in the parking lot, all the while talking and trying to convince Riveras that he was not doing anything wrong. At 5:32:48 p.m., Riveras told Defendant that he wanted to talk to Defendant first and Defendant walked back toward Riveras. At 5:33:15 p.m., Defendant walked away from Riveras , in the direction of the Quick Mart store, all the while hollering for someone in the store to help corroborate his story. Riveras then started walking after Defendant and yelled, "Hang on. Come here. Keithan."

Riveras testified that Defendant entered the store, made a quick left, and bent down beside a refrigerated cooler and dropped a bag with a twisty tie containing crack cocaine. Riveras testified that he grabbed Defendant by the throat and told him he would "tas him." He stated that Defendant broke free and fled the store on foot. Riveras pursued Defendant. Riveras testified that when he went back into the store approximately one to two minutes later, the drugs were gone. Riveras stated that he detained and searched those inside the store, but he did not find the drugs.

Riveras stated that he then made arrangements for Defendant's vehicle to be towed. Riveras stated that in accordance with police policy, he conducted an inventory search of the vehicle. During the search, he stated that he recovered a baggie containing "4 cubes" of crack under the driver's side mat. He also recovered a Glock pistol located under the center console caddy.

### III. FINDINGS OF FACT

The Court makes its factual findings in the analysis section of the report.

### IV. ANALYSIS

Defendant contended that his rights under the Fourth Amendment were violated because (1) there was neither probable cause nor reasonable suspicion to support a <u>Terry</u> investigation of Defendant, (2) Defendant and his vehicle were unlawfully seized and searched, and (3) Defendant did not voluntarily consent to the search of his vehicle. More specifically, Defendant argued that the <u>Terry</u> stop was invalid because it was based on an anonymous call and, furthermore, Defendant did not act nervous or flee from Officer Riveras when Riveras initiated contact with him in the parking lot at the Quick Mart.

The government, on the other hand, argued that there was sufficient evidence to conduct a Terry stop, because (1) Officer Riveras arrived at the Quick Mart approximately three minutes after receiving the call from dispatch, (2) the Quick Mart is located in a high crime area, (3) Defendant and the truck, including the license tag on the truck, matched the description given by the anonymous caller, (4) when Riveras pulled into the Quick Mart and parked behind the truck, the driver (Defendant) immediately exited the truck and walked away from it, (5) when Riveras told Defendant why he was there, Defendant became nervous and fidgety and his speech pattern changed, and (6) Defendant ignored Riveras verbal command not to walk away from him, and instead, darted into the Quick Mart, where Riveras observed Defendant drop a baggy of crack cocaine behind a cooler and then fled on foot from the store. As for the search of Defendant's vehicle, the government argued that Defendant freely consented to the search, and, furthermore, when Defendant fled the Quick Mart on foot, he abandoned the vehicle. Thus, the KPD could tow the vehicle and, incident to the car being towed/impounded, could conduct an inventory search.

*a. Initial Contact*

Based on the Court's review of the tape [Gov. Ex. 1] and Officer Riveras's testimony, the Court finds that when Riveras first initiated contact with Defendant Hunter outside the Quick Mart store, the encounter was consensual and, thus, does not constitute a seizure under the Fourth Amendment. The Sixth Circuit has held that "law enforcement officers may approach an individual and ask general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave." United States v. Waldon, 206 F.3d 597, 603 (6th Cir.

7

2000); see also Florida v. Bostick, 501 U.S. 429, 434-35 (1991) (explaining that "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage - as long as the police do not convey a message that compliance with their request is required"). Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not on any subjective suspicion of criminal activity. Waldon, 206 F.3d at 603. In other words, even if the officer suspects the citizen of wrongdoing, he may still engage in a consensual encounter with that citizen. Id.

In this case, the Court finds that at 5:29:28 p.m. Officer Riveras observed Defendant get out of a late model, Ford pickup truck that was parked at the Quick Mart store on Cherry Street. Riveras had been dispatched to this location based on an anonymous call that a black male was dealing drugs from a late model pickup truck, with tag number RMQ140, outside the store. When Defendant exited the truck, Riveras immediately recognized Defendant and called out to him, "Keithan." Upon hearing his name, Defendant stopped, turned around, and began walking back toward Riveras, without being instructed to do so. Riveras testified that he knew Defendant from a prior law enforcement encounter and that, based on that encounter, he also knew Defendant was a career criminal.

At 5:29:42 p.m., Riveras asked Defendant a few general questions regarding whether Defendant still owned a [Dodge] Durango. Riveras testified that approximately one hour before being dispatched to the Cherry Street Quick Mart, dispatch had broadcast a "BOLO" (be on lookout) for a red Dodge Durango involved in a "shots fired" nearby. Riveras stated that he knew Defendant owned a red Dodge Durango. At 5:29:49 p.m., Riveras asked to see Defendant's identification.

8

Defendant immediately and voluntarily walked back to his truck to retrieve his I.D. Up until this time, the Court finds that there is nothing in the record to indicate that Officer Riveras conducted himself in an intimidating or coercive manner. Riveras engaged in what appeared to be a relaxed and non-confrontational conversation with Defendant. Moreover, Officer Riveras gave Defendant no indication that he was not free to leave and to refuse to respond to questioning. Thus, the Court finds that Officer Riveras's initial encounter with Defendant, as well as Riveras's request for identification, was a consensual encounter and does not implicate the Fourth Amendment.

*b. Terry Investigation and Pat Down Search*

Immediately following Officer Riveras's request for identification, at 5:30:26 p.m. Riveras instructed Defendant to turn around and place his hands on the truck so that Riveras could pat him down for weapons. The frisk lasted approximately 15 seconds and no weapons or contraband were recovered from Defendant's person. At 5:30:55 p.m., Officer Riveras asked Defendant whether he owned the Ford pickup truck, in which Defendant had been observed sitting and from which Defendant had retrieved his I.D. Defendant stated that it was his work truck, which he used for cutting grass.

At 5:31:52 p.m., Riveras explained to Defendant that he was at the Quick Mart that day because someone had reported "that there was a guy sitting in a truck dealing drugs and that a guy in [the Quick Mart] was going to get them." Defendant responded, "oh, no, no, no, no, no." Defendant then proceeded to try to convince Riveras that he had not been doing anything wrong that day. Defendant began talking incessantly and called out to two men, who were standing across the parking lot next to a parked van, to help him corroborate his story. Shortly thereafter, Defendant

9

proceeded to walk away from Officer Riveras towards the two men. Riveras called Defendant back and told him that he wanted to talk to Defendant first. Approximately 25 seconds later, Defendant again quickly walked away from Riveras toward the Quick Mart store, all the while hollering for someone in the store to help corroborate his story. Officer Riveras yelled, "Hang on. Come here. Keithan." Defendant ignored Riveras's verbal command and, instead, continued to walk into the store and dropped a baggy containing, what appeared to Officer Riveras to be, crack cocaine. Officer Riveras then attempted to restrain Defendant, but Defendant broke free from Riveras's grasp and fled the store on foot.

At the suppression hearing, Defendant challenged the constitutionality of the Terry-type investigation, contending that the Terry stop was not supported by reasonable suspicion and that the degree of intrusion (search and seizure of Defendant and his vehicle) was unreasonable.

In evaluating the constitutionality of a Terry stop, the Court engages in a two-part analysis of the reasonableness of the stop. United States v. Davis, 430 F.3d 545, 354 (6th Cir. 2005). The Court first asks whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion. Id. If the stop was proper, then the Court must determine whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances. Id.

1. Reasonable Suspicion

The first part of the analysis is whether there was reasonable suspicion to justify the investigative detention. This determination, which is made in light of the totality of the

circumstances, requires the detaining officers to have a particularized and objective basis for suspecting the particular person stopped of criminal activity. United States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006). An inchoate and unparticularized suspicion or hunch will not do. Id. Reasonable suspicion need not arise, however, from an officer's direct observation, but can be based on informant tips and dispatcher information. Smoak v. Hall, 2006 WL 2455321 (6th Cir. Aug. 25, 2006). But rarely can an anonymous tip by itself constitute a basis for reasonable suspicion because an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity. See Florida v. J.L., 529 U.S. 266, 270 (2000); Alabama v. White, 496 U.S. 325, 329 (1990). Nevertheless, as the Sixth Circuit observed in United States v. Hudson, "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" 405 F.3d 425, 432 (6th Cir. 2005). Consequently, where a tip "contains independently verifiable details showing knowledge, that are sufficiently corroborated by the police prior to initiating a seizure of the suspect, reasonable suspicion exists." Id. Furthermore, the Sixth Circuit in United States v. Caruthers declined to "simply dismiss [an] anonymous call altogether," where other suspicious circumstances also existed. 458 F.3d at 465; see also United States v. Arvizu, 534 U.S. 266, 274 (2002) (instructing courts to avoid the approach of giving certain factors "no weight," because the "evaluation and rejection of...factors in insolation from each other does not take into account the totality of the circumstances").

In the present case, the Court finds that there was reasonable suspicion to justify an investigative stop of Defendant based on the following: First, Officer Riveras received a call from dispatch at 5:22 p.m. that an anonymous caller had reported that a black male was dealing drugs

11

from a late model pickup truck, with tag number RMQ140, outside the Quick Mart store on Cherry Street. Officer Riveras indicated he was approximately 3 minutes from the store, which he testified was located in a high-crime area, when he received the call. At 5:29 p.m., Officer Riveras pulled into the Quick Mart and observed a late model Ford pickup truck, with identical tags, and a black male sitting in the driver's seat. Based on the fact that Officer Riveras (1) arrived at the Quick Mart within approximately seven minutes after receiving the call, (2) positively identified the truck, by its description and tag number, and also (3) observed Defendant, who fit the description given by dispatch and who later confirmed that he owned the truck, sitting in the driver's seat of the parked truck, the Court finds that the anonymous caller's tip was corroborated, in the sense that it accurately described Defendant, the vehicle (including tag number), and the location.

Second, after confirming that the pickup truck belonged to Defendant, Riveras explained to Defendant that he was there because someone had reported that a black male, sitting in a truck (matching the description of Defendant's truck), was dealing drugs at the Quick Mart. In response, as Officer Riveras testified and as the Court observed on the video tape [Gov. Ex. 1], Defendant's behavior and speech pattern changed. Defendant became nervous and agitated; he started talking incessantly and moving around more. Shortly thereafter, Defendant walked away from Officer Riveras to speak to two other men; Officer Riveras had to call him back. A few seconds later, Defendant quickly walked away from Riveras again, but this time, he ignored Riveras's command to come back and, instead, darted into the Quick Mart store and dropped a baggy of what appeared to be, according to Riveras, crack cocaine. The Supreme Court has explained that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Illinois v. Wardlow, 528 U.S. 119, 124 (2000). Likewise, the Sixth Circuit agreed that "'the speed

of the suspect's movements may be relevant in the totality of the circumstances.'" <u>Caruthers</u>, 458 F.3d at 465.

Finally, the Court also factored into its analysis the fact that Officer Riveras encountered Defendant in a high-crime area. Although the "high-crime" area factor may not, without more, give rise to reasonable suspicion, it is relevant to the reasonable suspicion calculus. <u>Caruthers</u>, 458 F.3d at 477.

Based on the analysis above, the totality of the circumstances – (1) an individual, whose general appearance and location matched the description given in the anonymous call, (2) a pickup truck, whose location, description and license tag matched the description given in the anonymous call, (3) Defendant's nervous behavior and flight from Officer Riveras when Riveras explained why he was there, and (4) Officer Riveras's encounter with Defendant in a high-crime area - provided reasonable suspicion to conduct a <u>Terry</u> stop.

### 2. Degree of Intrusion

Next, the Court must ascertain whether the degree of intrusion (or detention) was reasonable, that is, (1) was it sufficiently limited in time, and (2) were the investigative means used the least intrusive means reasonably available. Defendant Hunter grounds his challenge not in the duration of the detention (which according to the tape was very brief) but in its means, specifically objecting to the search of his person and his vehicle. The Court will first address the pat down search of Defendant.

When an individual is subject to a lawful investigative stop, an officer may conduct a limited frisk or pat down of that person for weapons if the officer has reasonable suspicion of

13

criminal activity and a reasonable belief that the suspect he is investigating at close range may be armed and dangerous. Terry, 392 U.S. at 26-27; United States v. Walker, 181 F.3d 774, 778 (6th Cir. 1999). "[T]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [officer under] the circumstances would be warranted in the belief that his safety and that of others was in danger." Terry, 392 U.S. at 27; see also United States v. Thomas, No. 04-5872, 2005 WL 1869676, *2 (6th Cir. Aug. 3, 2005). In other words, "[t]he purpose of the search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence." United States v. Vite-Espinoza, 342 F.3d 462, 466 (6th Cir. 2003). In determining whether an officer's suspicion of danger and subsequent conduct are reasonable, "due weight must be given, not to his unchoate and unparticularized suspicion or 'hunch' but to specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Terry, 392 U.S. at 27. The Sixth Circuit has recognized that the association between drugs and weapons is a factor in determining the reasonableness of an investigatory search. United States v. Goodwin, 202 F.3d 270, 2000 WL 64972, at *7 (6th Cir. March 31, 1995) (unpublished); see also United States v. Bell, 762 F.2d 495, 500 (6th Cir.1985) (officer's inference that weapons are frequently involved in drug transactions based on his law enforcement experience was not unreasonable and is entitled to "due weight"); United States v. Walker, 51 F.3d 274, 1995 WL 141343, at *6 (6th Cir. March 31, 1995) (unpublished) ("agents could rely on the teaching of experience that weapons are frequently used in drug transactions").

      In this Case, the Court finds the following: (1) Officer Riveras, based on his prior law enforcement contact with Defendant, knew that Defendant Hunter was a career offender, (2) Officer Riveras was working alone that day and did not have backup, (3) the Quick Mart store was located

14

in a high-crime area, and (4) Officer Riveras was investigating a drug trafficking complaint. Considering the above circumstances, as well as noting the recognized association between drugs and weapons, and the fact that Officer Riveras immediately recognized Defendant and knew that he was a career offender, the Court finds that Officer Riveras could have reasonably believed that Defendant Hunter was potentially armed and dangerous. Thus, Officer Riveras could certainly conduct a limited pat down search or frisk for weapons for officer safety.

Accordingly, the Court finds that the seizure was sufficiently limited in duration (lasted approximately 15 seconds) and Officer Riveras's pat down search of Defendant was proper. Moreover, Officer Riveras recovered no weapons or contraband from Defendant's person.

c. Vehicle Search and Voluntary Consent

The remaining issue is whether the consent given by Defendant Hunter to search his vehicle was voluntary. While Officer Riveras testified that, under Tennessee Law, he could lawfully impound and inventory Defendant's vehicle because Defendant abandoned his vehicle when he fled the store, the government primarily relied upon consent to justify the search of Defendant's vehicle. The Defendant, on the other hand, argued that the warrantless search violated his Fourth Amendment rights because he did not voluntarily consent to the search of his vehicle. More specifically, he argued that he did not intelligently consent to the search because he believed Officer Riveras was there on a call/complaint related to a Dodge Durango, not on a call/complaint related to drug trafficking involving a late model pickup truck.

At 5:30:55 p.m., Officer Riveras asked Defendant whether he owned the Ford pickup truck, in which Defendant had been observed sitting and from which Defendant had retrieved his

15

I.D. Defendant stated that it was his work truck, which he used for cutting grass. At 5:31:52 p.m., Riveras explained to Defendant that he was investigating a complaint of drug trafficking at the Quick Mart, in which a guy was reported to be sitting in a truck dealing drugs. At 5:32:30 p.m., after Riveras explained to Defendant why he was there, Riveras asked Defendant, "Are you going to let me look through your truck?" Defendant replied, "Yes Sir. You can go ahead." Officer Riveras did not, however, immediately search the vehicle because he did not have any back up present and was concerned for his safety. Therefore, at 5:32:38 p.m., Riveras replied to Defendant, "When I get someone else out here, I'll take a look at it." At 5:33:15 p.m., Defendant quickly walked away from Riveras and darted into the Quick Mart store. A scuffle ensued between Riveras and Defendant Hunter inside the store and then Defendant fled the store on foot. A short time thereafter, Officer Riveras made arrangements for Defendant's vehicle to be towed and conducted an inventory search of the vehicle. During the search, Riveras recovered a baggie containing "4 cubes" of crack under the driver's side mat and a Glock pistol located under the center console caddy.

An officer may conduct a warrantless search when the person with a privacy interest in the item to be searched gives a free and voluntary consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219-22 (1973). Where the government alleges that consent was given voluntarily, however, "'the government bears the burden of proof on this issue' and 'the consent must be unequivocal and intelligently given, untainted by duress or coercion.'" United States v. Bueno, 21 F.3d 120, 126 (6th Cir. 1994). Whether a defendant's consent was voluntary is a question of fact to be determined from the totality of the circumstances. United States v. Mendenhall, 446 U.S. 544, 557 (1980); United States v. Van Shutters, 163 F.3d 331, 335 (6th Cir. 1998). Relevant factors include the defendant's

age, intelligence, and education; whether she understands her constitutional rights; the length and nature of the detention; and the use of coercive or punishing conduct by the police. United States v. Valdez, 147 Fed.Appx. 591, 596 (6th Cir. 2005). The Fourth Amendment requires only that the police reasonably believe the search to be consensual. Id. (citing Illinois v. Rodriguez, 497 U.S. 177, 185-86 (1990)).

Focusing the analysis on the government's consent argument, the Court finds, based on the record before it, that prior to asking Defendant for consent to search his vehicle, Officer Riveras specifically (1) informed Defendant that he was at the Quick Mart investigating a complaint of drug trafficking involving a pickup truck, and (2) asked Defendant whether he owned the Ford pickup truck, which Defendant had been observed sitting in. Defendant told Riveras that it was his work truck, which he used for cutting grass. Officer Riveras then asked Defendant whether he could "look through [Defendant's] truck" and Defendant responded, "Yes Sir. You can go ahead." To the extent that Defendant argues that he did not intelligently consent to the search, the Court disagrees.

The Court finds that Defendant's response to Officer Riveras's request to search the vehicle was specific, unequivocal, and intelligently given. Riveras explained why he was there and confirmed that Defendant owned the Ford pickup truck. In response to Riveras's request to search the vehicle, Defendant said, "Yes Sir. You can go ahead." Based on the Court's review of the tape [Gov. Ex. 1], Defendant appeared to understand the conversation he had with Officer Riveras; he responded intelligently; and Officer Riveras appeared to have no trouble communicating with him. Officer Riveras did not have his weapon drawn and did not threaten and/or intimidate Defendant in any capacity. The entire encounter between Defendant and Officer Riveras lasted approximately

17

four (4) minutes and at no time during the encounter did Defendant withdraw consent. Furthermore, testimony revealed that Defendant is a career offender, making it highly unlikely that he is unfamiliar with the criminal justice system.

Based on the totality of the circumstances, as discussed above, the Court concludes that a reasonable police officer would have believed that Defendant Hunter's response indicated that he clearly and unequivocally consented to the search. Thus, the Court finds that consent was given "freely and voluntarily," and was not "merely a response conveying an expression of futility in resistance to authority or acquiescing in the officer's request." See United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999). Accordingly, the Court finds that the government has met it burden, by a preponderance of the evidence, and shown, through clear and positive testimony, that valid consent to search was obtained. As such, the Court recommends that the District Court deny Defendant Hunter's request to suppress the evidence seized from Defendant's vehicle, including the crack cocaine and Glock pistol.

Having found that Defendant voluntarily consented to the search of his vehicle, the Court finds it unnecessary to determine whether Defendant also abandoned his vehicle when he fled the store, thus permitting Officer Riveras to impound and inventory the vehicle's contents.

## V. CONCLUSION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that Defendant Keithan Hunter's Motion To Suppress Evidence Obtained On May 21, 2006 [**Doc. 23**] be **DENIED**.[1]

Respectfully submitted,

   s/ C. Clifford Shirley, Jr.   
United States Magistrate Judge

---

[1] Any objections to this Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).